# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

# CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>SHAWN COURTNEY TEMPLE,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:11CR209DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendant Shawn Courtney Temple's Motion to Suppress all evidence seized and all statements elicited in this case in violation of Defendant's constitutional rights. The court held two evidentiary hearings on the motion to suppress on July 13, 2011, and August 8, 2001, and closing arguments on September 9, 2011. At the hearings, Defendant was present and represented by James C. Bradshaw, and Plaintiff was represented by Timothy J. Williams. The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the parties' memoranda, and the law and facts relating to this motion. Now being fully advised, the court renders the following Memorandum Decision and Order on Defendant's motion.

## A. FINDINGS OF FACT

During the early morning hours of December 4, 2010, in response to information from an informant, officers, including West Valley Police Detective Aaron Cheshire, were

observing co-defendant Tyler Howell's apartment. After Howell left the apartment, officers followed him. At approximately 1:36 a.m., West Valley Detective John Dietrich stopped Howell for a traffic violation. Howell was arrested based on outstanding warrants for his arrest.

During an inventory search of the vehicle, officers found a stolen rifle. Det. Dietrich interviewed Howell first. Howell initially lied to Dietrich about his possession of the gun. Det. Cheshire then arrived and interviewed Howell. During the course of their interview, Howell recanted his initial story and admitted that he had in fact stolen the gun from a residence he had burglarized. Howell also admitted to both officers that he possessed additional stolen property at his apartment, including another firearm.

Howell gave Det. Dietrich verbal consent to search the apartment. During separate interviews alone with Det. Cheshire and Det. Dietrich, Howell stated that there were several friends at his apartment and he did not want to get them in trouble. He told Det. Dietrich that he had a friend named John who had been staying with him for the past several days and that he had property in his closet. In contrast, he told Det. Cheshire, the officer he confessed to, that a friend named Thumper was staying with him, but did not mention anything about his property.

Det. Dietrich, who had arrested Howell, took Howell back to his apartment. Det. Cheshire waited for a two truck to come to impound Howell's vehicle. He then proceeded to Howell's apartment.

Det. Dietrich arrived at Howell's apartment at 2:30 a.m. Det. Dietrich knew that there were several people in the apartment at the time and that there was also at least one firearm. Therefore, other officers arrived for safety reasons. Det. Dietrich stated that some briefing of the

2

other officers would have occurred before he entered the apartment, but he does not recall exactly how long the briefing of the officers took nor does he recall exactly what time he entered the apartment with Howell. Det. Dietrich knocked on the door with Howell at his side in handcuffs. An occupant of the apartment opened the door, and Det. Dietrich and Howell entered. Other officers followed them into the apartment.

Officers conducted a protective sweep of the apartment and assembled the four occupants found in the apartment in the living room. Defendant Shawn Temple was one of the occupants of the apartment. In order to conduct the search of the home, officers needed the occupants to remain in one place. Officers stayed with the other occupants in the living room while Det. Dietrich took Howell to his bedroom. This began while officers were waiting for Det. Cheshire to arrive with a written consent to search form, so they could begin their search.

When Det. Cheshire arrived he read the consent to search form and gave it to Howell to read. The form indicates the address of the apartment as the premises to be searched and that stolen property is the object of the search. The form also contains typed information advising the consenting party that the officers do not have a warrant and the individual does not have to give consent to search. Howell is the sole lessee of the apartment.

Howell signed and dated the consent at 3:12 a.m. This time is approximately 45 minutes after officers indicated that they arrived at the apartment. It is unclear how long the officers had been inside the apartment because Dietrich did not recall how long the officers briefed each other about the case before entering the apartment. Dietrich testified that Howell signed the form within about five minutes of being in the apartment. But Det. Cheshire testified that all of the

occupants of the apartment were already assembled in the living room by the time he arrived with the consent form so it could have been longer.

At the time Howell signed the consent form, Detectives Cheshire and Dietrich both knew that Howell was the sole lessee of the apartment and that he had a least one person staying with him. Howell had told Det. Dietrich that a friend named Jon had been staying with him for a few days and had some belongings in the apartment. Howell had also told Det. Cheshire that his friend Thumper had been staying with him for five days. Howell later identified Thumper as Defendant Shawn Temple. Howell, however, at that time, did not specifically mention to Det. Cheshire that Defendant had any property at the apartment. Although one of the occupants of the apartment was Jon Diaz and one of the occupants was Defendant, the officers did not seek consent to search from Diaz or Defendant before searching.

The consent form states the address of the apartment and states that it is to search for stolen property. There is a blank line above the address of the apartment. But both detectives believed that the form indicated that the search was for the entire apartment and both detectives understood that Howell had given them consent to search the entire apartment. During the time Howell was presented with, read and signed the consent form, he never objected to or limited the scope of the search. Likewise, the Defendant who was in the apartment while it was being searched, never voiced any objection or concerns about the scope of the search.

Officers then began a search of the entire one-bedroom apartment, including Howell's bedroom, bathroom, kitchen, living room, balcony, and bedroom walk-in closet. During the search, Howell assisted by pointing out stolen property. While some officers were participating

in the search of the apartment, other officers were interviewing the occupants of the apartment. Each occupant was at some point taken to the kitchen area of the home and photographed with a whiteboard stating their name, the investigation case number, and their contact information. After being photographed the occupant was taken back to the living room. Each occupant was also taken at some point out to a patrol car for individual questioning. After the questioning, the occupants were escorted back into the living room of the apartment.

After Howell claimed there was no other stolen property, Det. Dietrich took him to his patrol car with the intention of taking him to be booked into jail. Before Det. Dietrich left the apartment complex, however, he was summoned to return with Howell to discuss another stolen gun that Det. Cheshire had found in his search of the bedroom closet. Det. Dietrich and Howell returned to the apartment.

When Det. Cheshire found the handgun, it was in a black messenger type bag hanging on a hanger in Howell's closet, and there was no marking or identification on the bag. Det. Cheshire stated that he could not tell that the property in Howell's closet belonged to more than one person. When Det. Cheshire had Howell brought back up to the apartment to be questioned about the gun, Howell stated that he had sold the gun to Defendant and thought that Defendant had sold it to someone else. Howell stated that the black bag was Defendant's bag. Det. Dietrich then transported Howell to jail.

After Howell implicated Defendant as the owner of the gun, Det. Cheshire asked Defendant to go outside to discuss the gun and the bag. Det. Cheshire testified that he specifically informed Defendant prior to speaking with him that he was not under arrest and was

5

free to leave any time. Det. Cheshire did not advise Defendant of his *Miranda* rights because he stated that he did not believe that Defendant was in custody. Defendant spoke to Det. Cheshire about the handgun and the bag. Defendant admitted the bag was his but denied that the gun belonged to him. He stated that Howell had asked him to put the gun in his bag so that the others in the apartment would not see it and take it. Defendant also admitted to Det. Cheshire that he was addicted to heroin.

Det. Cheshire did not arrest Defendant that night. He told Defendant that even if it was not his gun, his involvement with the gun could lead to charges but he would need to check with an attorney. Det. Cheshire took Defendant back inside the apartment and did not interview any of the other occupants about the gun. None of the occupants of the apartment were arrested that night. Det. Cheshire believes that he left the apartment at 4:58 a.m., the time his report states is his "completed time."

In the following days, Det. Cheshire spoke with an Assistant District Attorney about the case and was told that there was probable cause to arrest Defendant on a firearms charge. Based on this information, Det. Cheshire advised other officers that he wanted to have Defendant picked up. On December 10, 2011, West Valley Detective David McPhie made a traffic stop of a vehicle being driven by Shylee Rowe and in which the Defendant was a passenger. Ms. Rowe had warrants out for her arrest. Defendant was taken to the West Valley Police Department. Defendant was arrested and Det. Cheshire interveiwed Defendant. Det. Cheshire read Defendant his *Miranda* rights, and Defendant voluntarily spoke with Det. Cheshire again about the gun. The information Defendant provided to Det. Cheshire during this interview was consistent with

what he had told Det. Cheshire on December 4, 2010.

**B. CONCLUSIONS OF LAW**

Defendant challenges the constitutionality of Defendant's detention, the search of the apartment, and the officers' questioning of Defendant on December 4, 2010. Defendant also argues that Defendant's arrest and questioning on December 10, 2010, were tainted by the alleged constitutional violations on December 4, 2010. Accordingly, Defendant asks the court to suppress the gun seized on December 4, 2010, Defendant's statements to officers on December 4, 2010, and Defendant's statements to officers on December 10, 2010.

**I. Detention**

There are three general types of police-citizen encounters: "(1) consensual encounters; (2) investigative detentions; and (3) arrests." *United States v. Garcia*, 459 F.3d 1059, 1062-63 (10th Cir. 2006). Consensual encounters are not seizures within the meaning of the Fourth Amendment. *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). To determine whether a police encounter is a seizure for purposes of the Fourth Amendment, the Court "must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). In making this examination, the Court may look to many factors: whether the encounter occurred in a private or public place; if the officer touched the defendant or otherwise physically restrained him; whether the officer was in uniform; if weapons were displayed; the number of officers; the officer's demeanor and tone of voice; if officers retained the defendant's personal items; and

7

whether the defendant was told he was free to terminate the encounter. *United States v. Zapata*, 997 F.2d 751, 756-57 (10th Cir. 1993).

A police-citizen encounter can begin in one category and escalate or evolve into another. Judicial review of police-citizen encounters should proceed in a step-by-step fashion, focusing on each stage of the encounter. *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996). In this case, the officers initially detained Defendant and the other occupants of the apartment for officer safety and for purposes of determining any involvement in the stolen property. Upon entering the residence, the officers knew there would be several people and the presence of guns. Therefore, the safety sweep and relocation of the occupants to one, central location was necessary for police safety.

Once Defendant and the other occupants were detained in the living room, the officers reasonably detained the occupants for questioning regarding their information of or potential involvement with the stolen property. Each occupant was questioned individually. Undoubtedly, this process took some time due to the number of occupants. The court finds the officers questioning of the occupants on an individual basis to be reasonably conducted under the circumstances of the case.

Although the officers were controlling the situation in the apartment and keeping the occupants in one area while they conducted the search of the apartment, there is no evidence that there was any threatening behavior, drawn weapons, or physical touching. All of the testimony supports the finding that the occupants were cooperative, there was easy communication between the officers and occupants, and the environment in the apartment was civil.

The length of time Defendant and the occupants were detained is in question. Defendant contends that the prolonged detention constituted a *de facto* arrest rather than investigative detention. Although Defendant states that the detention was three hours long, the record does not support a finding that he was detained a full three hours and the argument fails to recognize that the type of detention evolved over time. Defendant was first detained during a protective sweep for officer safety, he was then detained for questioning with respect to the stolen property in the apartment, and finally he was detained specifically to be questioned about his alleged ownership of a gun found during the search.

Some of the officers indicate that they arrived at the apartment at 2:30 a.m. This time, however, cannot accurately be used as the time that the officers entered the apartment. Det. Dietrich testified that he briefed his sergeant and the other officers prior to entering the apartment. He did not indicate how long that briefing took. However, Det. Dietrich did not indicate that there was a very long wait between the time when they entered the apartment and the time Det. Cheshire arrived with the consent to search form. According to Det. Cheshire's testimony, the officers had relocated the occupants of the apartment to the living room and had begun talking to them before he arrived with the consent form at 3:12 a.m. Accordingly, the questioning of the occupants in the apartment appears to have lasted close to an hour. The court notes, however, that because the questioning of the occupants was occurring one at a time, the occupants were not subjected to questioning throughout that entire hour.

Once Det. Cheshire found the handgun in the black bag in the closet and Howell alleged that Defendant owned the gun, the officers had a new reasonable articulable suspicion for

questioning Defendant. Det. Dietrich testified that 3:48 a.m. was probably the time he was taking Howell to jail. It is unclear whether this is the first time he was leaving to take Howell, or the second time. However, Det. Cheshire indicated that he had left the apartment and had closed the investigation at 4:58 a.m. Therefore, Defendant was not questioned regarding his ownership of the gun for more than an hour, and it is likely that the questioning was shorter than that.

When Det. Cheshire questioned Defendant about the gun, he told Defendant that he was not under arrest and was free to leave at anytime. In fact, even after the questioning that morning, Defendant was not arrested. For most of the detention, Defendant was inside his apartment with friends. The periods of time in which Defendant was questioned by detectives does not appear unreasonable. The facts do not support a finding of *de facto* arrest. Accordingly, the court concludes that the detention met constitutional requirements.

## II. Search of Apartment

Defendant next challenges the constitutionality of the search of his belongings. Defendants contends that he did not consent to the search and Howell did not have the authority to consent on his behalf. The Fourth Amendment to the United States Constitution provides the right to be free from "unreasonable searches and seizures." "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Id.*; *see also Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993) (evidentiary

searches conducted without a search warrant are generally presumed unreasonable, subject to a few specific exceptions to the warrant requirement).

Because Howell voluntarily gave the officers verbal and written consent to search his apartment, the question presented by this motion is whether Howell had actual or apparent authority to provide such consent. Determination of who can give valid consent to search a particular area is judged by an objective reasonableness standard. The question for the officer who is attempting to obtain valid consent to consider is whether the facts available at the moment warrant a person of reasonable caution to believe that the consenting person had authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

In *United States v. Matlock*, the United States Supreme Court held that police may obtain valid consent to search from a third-party with common authority over the premises. 415 U.S. 164, 170-71 (1974). As the Court explained in *Matlock*, common authority is not tied to 'the law of property, with its attendant historical and legal refinements, . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants have the right to permit the inspection in his [or her] own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7.

Relying on and applying *Matlock*, the Tenth Circuit Court of Appeals, in *United States v. Rith*, held that a third party's consent to search is valid if that person has mutual use of the property through joint access or control for most purposes. 164 F.3d 1323, 1328-29 (10th Cir. 1999). In explaining the test for third-party consent, the *Rith* court held that the inquiry into

common authority is disjunctive. *Id.* "[A] third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *Id.* The court explained that "[m]utual use of property by virtue of joint access is a fact-sensitive inquiry which requires findings by a court that the third party entered the premises or room at will, without the consent of the subject of the search." *Id.* at 1329-30.

In this case, Howell was the only lessee of the property. Prior to going to the apartment, Howell had informed the detectives that a friend had been staying with him for several days and he had indicated to Det. Dietrich that his friend had some personal property in his closet. Once they got to the apartment, the officers obtained the occupants' names and contact information. Defendant's picture with his contact information states that his address is someplace other than the apartment. Howell signed a consent to search form that provided only the address of the apartment. Both officers testified that the reason for listing only the address was Howell's consent to search the entire apartment. Howell did not object or limit the scope of the search.

Likewise, Defendant, who was in the apartment at the time of the search, never voiced any objection or concern about the areas or items being searched. Defendant never revealed that he may have had a superior privacy interest to Howell in any part of the premises. Moreover, the black bag in the closet had no markings on it that would have revealed to the officers that it did not belong to Howell. Although Howell later told officers that Defendant had his belongings on one side of the closet, there was no apparent demarcation to the officers at the time of the search. Howell had not told Det. Cheshire that anyone else had belongings in the closet prior to his

statements after Det. Cheshire found the gun in the black bag. Based on the totality of the circumstances and the facts the officers had at the time of the search, it was reasonably for the officers to believe that Howell had actual, or apparent, authority to consent to the search of his apartment, including the black bag in the closet.

**III. December 4, 2010 Questioning**

Defendant argues that all statements he made to Det. Cheshire on December 4, 2010 should be suppressed because he was not advised of his *Miranda* rights prior to the questioning. *Miranda* requires that procedural safeguards be administered to "custodial interrogations." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). A *Miranda* warning must be given when the suspect is (1) in custody and (2) the questioning meets the legal definition of interrogation. *Id.*

First, a person is in custody when his freedom of action is curtailed "to a degree associated with formal arrest." *Id.* In this case, Defendant had been detained for questioning off an on, and the detention was not a *de facto* arrest based on the length of the detention. However, at the time that Defendant was taken outside away from the others to answer questions specifically about his alleged ownership of a gun, he was in custody for purposes of *Miranda*. Even though Detective Cheshire told him that he was not under arrest and was free to go at any time, a reasonable person would not have felt free to leave. The fact that Defendant was not actually arrested that night is irrelevant to whether he would have reasonably felt that he was in a custodial interrogation when he was being questioned about the gun.

Next, interrogation is defined as "any words or actions on the part of the police 'that the

police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* at 1464. When Det. Cheshire asked him about the gun, he should have known that the response was reasonably likely to elicit an incriminating response regarding the possibility that Defendant did, in fact, own the gun. Howell had told Det. Cheshire that he had stolen the gun and sold it to Defendant and that Defendant wanted to sell the gun too. Howell had also told the officers that because the person who wanted to buy the gun from Defendant did not want to buy a stolen gun, Howell and Defendant had another person scratch off the serial number. Det. Cheshire also asked Defendant whether he was addicted to narcotics, which was also likely to elicit an incriminating response. Defendant had not been advised of his *Miranda* rights at that time and, therefore, had not been counseled that anything he said could be used against him. The court concludes that Det. Cheshire's failure to advise Defendant of his *Miranda* rights violated Defendant's constitutional rights and the court suppresses all statements Defendant made to Det. Cheshire the night of December 4, 2010.

**IV. December 10, 2010 Questioning**

Finally, Defendant asks this court to suppress Defendant's statements to Det. Cheshire during their December 10, 2010 interview as the fruits of the prior constitutional violation. Defendant's statements to Det. Cheshire on December 10, 2010, were made after he had been arrested, advised of his *Miranda* rights, and voluntarily waived those rights.

To determine whether a post-*Miranda* statement is admissible when a suspect previously gave an unwarned statement, courts apply *Missouri v. Seibert*, 542 U.S. 600 (2004), ad *Oregon v. Elstad*, 470 U.S. 298 (1985). The relevant factors identified in *Seibert* as bearing on whether the

later *Miranda* warning was effective enough to overcome the prior violation include: 1) the completeness and detail of the questions and answers in the first round of interrogation; 2) the overlapping content of the two statements; 3) the timing and setting of the first and the second; 4) the continuity of police personnel, and 5) the degree to which the interrogator's questions treated the second round as continuous with the first. *Seibert*, 542 U.S. at 615 (plurality opinion). The Tenth Circuit has recognized that "these factors, all of which concern the relationship between the first and second interrogations, are intended to aid courts in determining whether an initial, unwarned interrogation operated to 'thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted.'" *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1150 (10th Cir. 2006).

In this case, Det. Cheshire conducted both interrogations and discussed the same subject matter with Defendant. However, the interrogations were a week apart and conducted in significantly different settings. At the first interrogation, Defendant was right outside his apartment and he was responding to statements that Howell had just made about his involvement with the gun. However, the second interrogation a week later, was at the police station after Defendant had been arrested on gun charges.

The court does not find facts in this case to support Defendant's assertion that *Miranda* was intentionally thwarted or that Det. Cheshire did not give *Miranda* for some improper purpose. Rather, the facts demonstrate that Det. Cheshire had no intentions of arresting Defendant on December 4, 2010, and thus did not believe that *Miranda* was necessary because Defendant was not in custody. While the court concluded that a reasonable person in

15

Defendant's position would not have felt free to leave despite being told that he was, the court believes that the question of whether Defendant was in custody was close enough that no bad motives can be ascribed to the officer. The initial failure to give *Miranda* was an innocent mistake.

Given the amount of time that passed between the two interrogations and the change in circumstances, the court does not believe that the statements made in the second interrogation should be suppressed as fruit of previous constitutional violation. A reasonable person in Defendant's position would have felt comfortable in asserting his or her *Miranda* rights at the December 10, 2010 interview. Therefore, the court finds no basis for suppressing Defendant's statements made in the December 10, 2010 interview with Det. Cheshire.

### III. Conclusion

Based on the foregoing, it is hereby ordered that Defendant's Motion to Suppress Evidence is GRANTED as to his request to suppress statements made to Detective Cheshire on December 4, 2010, and DENIED in all other respects.

DATED this 30th day of September, 2010.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge